IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

IRISH JENKINS,                        )
                                      )
           Plaintiff,                 )
                                      )
    v.                                )        Case No. 2:17-cv-364-RAH
                                      )              [WO]
KOCH FOODS, INC., *et al.*,            )
                                      )
           Defendants.                )

**MEMORANDUM OPINION AND ORDER**

Plaintiff Irish Jenkins filed this employment discrimination lawsuit, alleging

numerous causes of action against his former employer, Koch Foods of Alabama

LLC (Ala-Koch); Ala-Koch's parent company, Koch Foods, Inc. (Koch Foods); and

Melissa McDickinson and David Birchfield, two former Ala-Koch employees who

served as human resource supervisors during Jenkins's employment. This matter

comes before the Court on the following motions: Ala-Koch's *Motion for Summary

Judgment and Renewed Motion for Judgment as a Matter of Law* (Doc. 179), Koch

Foods's *Motion for Summary Judgment as to Plaintiff's Claims and Memorandum

in Support* (Doc. 181), David Birchfield's *Motion for Summary Judgment and Brief

in Support* (Doc. 178), and Melissa McDickinson's *Motion for Summary Judgment

and Brief in Support* (Doc. 177). All four motions have been fully briefed and are

ripe for decision. For the following reasons, these pending motions are due to be granted.

## I.   BACKGROUND

Jenkins's case joins a line of sexual harassment claims centering around two human resource supervisors at the Ala-Koch chicken processing plant in Montgomery, Alabama.

The short story of his case, according to Jenkins, is this: (1) a female human resource (HR) manager was in a romantic relationship with the male director of her department; (2) at the same time, the female HR manager began a consensual sexual relationship with one of her male subordinates, promising to give him extra time off along with other benefits in exchange for sex; (3) the male HR director asked to watch the female manager have sex with the subordinate employee; (4) the subordinate employee refused this invitation; and (5) several months later, the subordinate employee was fired for purportedly taking too many smoke breaks.

The long version is no less salacious.  Shortly after being released from prison, Irish Jenkins considered himself blessed to have found work at Ala-Koch in 2013. (Doc. 182-2 at 30.) During his first year on the job, Jenkins received good performance reviews and was promoted to inventory clerk in the purchasing department. Despite being a generally good employee, Jenkins was not without his issues. On three separate occasions in 2014, following intraoffice conflicts, Ala-

Koch required Jenkins to be re-trained on the company's harassment and anti-discrimination policy. (Doc. 180 at 9.) Suffice it to say, Jenkins was well-versed on the policy and its anti-harassment and anti-fraternization provisions.

Despite this knowledge, in 2015, although Jenkins was in a romantic relationship with another woman, he began an admittedly "consensual" sexual relationship with Defendant Melissa McDickinson, a human resources supervisor[1] at the Montgomery, Alabama de-bone plant, who herself was rumored to be in a sexual relationship with HR director David Birchfield. (Doc. 176-10; Doc. 189-15 at 42.)

The relationship began in October 2015 after McDickinson sent a message to Jenkins telling him that she was attracted to him. (Doc. 176-10 at 1.) Jenkins was clear in his deposition about who initiated the relationship, "I didn't present myself to her. She came at me, man." (Doc. 182-2 at 35.)  McDickinson told Jenkins she wanted to "hang out" and that she had a sexual preference for black men. (Doc. 189-3 at 84.) She also told Jenkins that as long as he was with her, he could do whatever he wanted to at work. (*Id*. at 85.)

Between October 2015 and March 2016, Jenkins and McDickinson had sexual intercourse on upwards of ten occasions (Doc. 182-2 at 46), McDickinson performed

---

[1] McDickinson and Birchfield are sometimes referred to as supervisors and at other times as managers, both of which are terms used interchangeably in this opinion since the parties use the terms interchangeably.

oral sex on Jenkins on at least five occasions (Doc. 182-2 at 42), and she manually stimulated his penis on at least three occasions (*Id.* at 31). They had sex at work, many times in McDickinson's office; they had sex around town, at bars and restaurants, in parking lots and on streets; and one time, they had sex at Jenkins's friend's apartment while Jenkins's friend was in the room and Jenkins's stepdaughter was downstairs. (*Id.* at 46-47.)

Jenkins himself described their relationship as "indeed consensual." (Doc. 176-10 at 1.)  In his deposition, Jenkins testified that he enjoyed the interactions (Doc. 182-2 at 42); that he would frequently wear a condom when they had sex (*Id.* at 45); that he had an orgasm during almost every sex act (*Id.*); that he could have stepped away from McDickinson if he wanted (*Id.* at 34); that McDickinson never threatened his job if he refused to participate (*Id.*); that they would speak on the phone frequently and talk about their personal lives (Doc. 182-12 at 9); and that he felt comfortable refusing McDickinson's requests that Jenkins leave his then-girlfriend, now fiancé, to date McDickinson exclusively (*Id.* at 36).

But Jenkins was concerned about getting caught either by his co-workers or his soon-to-be fiancé. During their in-office interactions, Jenkins would make a point to lock McDickinson's office door. (Doc. 182-2 at 41.)  One time, while receiving oral sex in an Ala-Koch warehouse, Jenkins recalls telling McDickinson that she was "wild" and that they were "going to get caught" by their co-workers. (Doc. 182-2 at

33.) Jenkins could only recall trying to end the relationship "once or twice" because the affair posed a risk to his job and his relationship with his soon-to-be fiancé. (*Id.* at 47.)

Although he maintains the relationship was consensual, Jenkins also felt like he had no other choice but to engage with McDickinson. In his deposition, Jenkins testified, "I needed my job, so I went through with it, man, to keep my job." (*Id.* at 33.) And when asked why he did not physically separate from McDickinson, Jenkins responded, "Put my hand on her? No. Push her and go back to prison? No. . . . God blessed me with that job. So I just – I went along what she asked me . . . she had me, man. She got me." (*Id.*) Every time they engaged sexually, Jenkins says he "just wanted to get everything over with." (*Id*. at 117.)

## A. Rumor & Investigation

At some point during the summer of 2015, word spread throughout Ala-Koch that Jenkins was having sex with McDickinson in exchange for time off. (Doc. 180 at 11.) The rumors garnered enough traction for Ala-Koch to investigate. In August 2015, despite the rumors implicating Birchfield being in a sexual relationship with McDickinson, Ala-Koch assigned David Birchfield to investigate the rumors about McDickinson and Jenkins. And according to Birchfield, after investigating, all persons implicated in the rumors denied any such activity. (Doc. 180 at 11.)

Birchfield's initial investigation did not put the rumors to bed. Rather, the rumors continued, as did McDickinson and Jenkins's affair, throughout the winter of 2015. In December 2015, Birchfield claims to have investigated the rumors again after hearing that Jenkins was bragging to co-workers about having sex with McDickinson. (Doc. 176-21 at 83.)

On December 12, 2015, Birchfield called Jenkins into his office. While Birchfield testified that he was merely investigating the rumors, Jenkins believes that Birchfield was attempting to threaten him because Jenkins was having sexual encounters with McDickinson while not allowing Birchfield to watch. (Doc. 176-10 at 3.) Unbeknownst to Birchfield, Jenkins recorded their discussion. (Doc. 182-10 at 30.) During the conversation, Birchfield directly asked Jenkins, "Are you fucking Melissa?" and Jenkins responded, "No, man!" (*Id.*) Throughout the recording, Jenkins repeatedly denied ever having sex with McDickinson. Nothing said during the conversation indicated that Birchfield was aware that McDickinson and Jenkins were having an affair, let alone that Birchfield had already requested to watch them have sex.

Five days after this conversation, on December 17, 2015, Jenkins signed a statement prepared by Birchfield denying that he had ever "been involved with Melissa McDickinson." (*Id.* at 32.) Jenkins claims that he was pressured into signing this false statement by Birchfield.  (Doc. 182-12 at 9.)

6

**B. Birchfield's Propositions**

No one else participated in or witnessed McDickinson and Jenkins's sexual escapades—but not for a lack of trying, according to Jenkins. Beginning sometime in November of 2015, a month or so into their affair, McDickinson began asking Jenkins if Birchfield could watch Jenkins have sex with her. (Doc. 189-3 at 85.) Each time, Jenkins refused. (Doc. 176-10 at 2.) Their relationship continued into the new year, as did McDickinson's attempts to obtain Jenkins's permission to allow Birchfield to watch them have sex.

Sometime in January 2016, Jenkins was called into McDickinson's office, and with Birchfield present, McDickinson asked if Jenkins had reconsidered allowing Birchfield to watch. (Doc. 189-3 at 86.) Again, Jenkins refused. (Doc. 176-10 at 3.) This was the last request made by McDickinson although the two may have continued their liaisons for several more months until Jenkins left Ala-Koch. (Doc. 182-2 at 51.)

**C. Jenkins's Absence Issues and Termination**

Throughout his relationship with McDickinson, Jenkins's work attendance was perceived as "problematic." (Doc. 189-9 at 52.) Jenkins routinely was seen roaming the plant and leaving his work area to take smoke breaks—breaks that he would often take with co-workers, including McDickinson and Birchfield. While these

breaks violated Ala-Koch's policies, taking smoke breaks seemed to be a norm at Ala-Koch and was widely tolerated. (*Id*. at 53.)

As it related to Jenkins, that tolerance seemingly came to an end when Bobby Cotton was made de-bone plant manager. On December 7, 2015, Cotton observed Jenkins smoking in an unauthorized area, resulting in a disciplinary warning issued by Laura Cortes, an HR official. (Doc. 182-10 at 27.) Within days, Jenkins was issued another disciplinary warning for showing up late to work and leaving early. (*Id*. at 29.) This served as his "final" warning, bringing him within one disciplinary point of termination under Ala-Koch's attendance point system. (*Id.*)

In late March, Jenkins was again reported for taking a smoke break while on the clock. (Doc. 182-10 at 34.) Acting on this report, Laura Cortes suspended Jenkins on March 21, 2016, pending an investigation. (Doc. 182-12 at 2; Doc. 189-9 at 53–54.)

Then, on March 28, 2016, while Jenkins was still serving his suspension, he was terminated for "stealing company time." (Doc. 182-12 at 5.) The termination paperwork was signed by Cortes, Jenkins's direct supervisor, Jeffrey Shaw, and Rebecca Milam, an HR clerk who also happened to be McDickinson's sister-in-law. (*Id.* at 5–7.) Cortes had the authority to terminate Jenkins. (Doc. 182-11 at 23.)

Jenkins contends that the decision to fire him actually came from Birchfield (Doc. 182-2 at 78), because McDickinson had at one time vaguely mentioned that

Birchfield wanted to fire Jenkins and another Ala-Koch employee. (*Id.* at 44). Jenkins also maintains that Birchfield falsely accused him of stealing company time and that he was actually fired because he refused to allow Birchfield to watch him have sex with McDickinson. (Doc. 1 at 10.)  Cortes, however, states that Bobby Cotton made the decision to fire Jenkins because he "wanted [Jenkins] gone." (Doc. 189-9 at 54.) And given Jenkins's attendance track record, Cortes believed that Jenkins "should not have lasted [at Ala-Koch] as long as he did last." (*Id.* at 56.)

**D. Jenkins's Complaint, EEOC Charge, and Lawsuit**

Prior to his suspension, Jenkins never reported his sexual relationship with McDickinson, or her requests to allow Birchfield to watch their encounters, to anyone at Ala-Koch. When asked why he did not complain, Jenkins testified, "[W]ho could I speak to? . . . [T]he people I thought could help me was the ones that . . . that did what they did to me . . . ." (Doc. 182-2 at 51.)

However, after he was suspended, Jenkins contacted Bobby Elrod, Koch Foods's corporate director of human resources, and filed a complaint alleging that he had been harassed by McDickinson and also that McDickinson and Birchfield were involved in a sexual relationship. (Doc. 176-10 at 3; Doc. 182-12 at 9–10.) Neither Elrod nor anyone else at Ala-Koch followed up with Jenkins regarding his complaint.

After receiving no response to his complaint, Jenkins filed an EEOC charge on June 17, 2016, alleging sex discrimination, race discrimination, and retaliation. (Doc. 182-14 at 1.) And after he received a right-to-sue letter from the EEOC, he filed the instant lawsuit.

## E. The Present Litigation

Jenkins filed suit on June 5, 2017, against Ala-Koch, Koch Foods, McDickinson, and Birchfield. (Doc. 1.) In his Complaint, Jenkins brings three federal and four state law claims:

- Count I—Title VII Sexual Harassment Against Ala-Koch and Koch Foods

- Count II—Title VII & § 1981 Race Discrimination and Harassment Against Ala-Koch and Koch Foods

- Count III—Title VII Sex Discrimination and Harassment Against Ala-Koch and Koch Foods

- Count IV—Title VII & § 1981 Retaliation Against Ala-Koch and Koch Foods

- Count V—Invasion of Privacy Against All Defendants

- Count VI—Assault and Battery Against All Defendants

- Count VII—Negligent Retention/Training Against Ala-Koch and Koch Foods

- Count VIII—Outrage/Intentional Infliction of Emotional Distress Against All Defendants

## II.    JURISDICTION AND VENUE

Subject matter jurisdiction is conferred by 28 U.S.C. § 1331 as to Jenkins's federal causes of action, and the Court may exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both. *See* 28 U.S.C. § 1391.

## III.    STANDARD OF REVIEW

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a), (c).  No genuine issue of material fact exists if the opposing party fails to make a sufficient showing on an essential element of her case as to which she would have the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Just as important, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986).  In making this assessment, the Court must "view all the evidence and all factual inferences

reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc*., 117 F.3d 1278, 1285 (11th Cir. 1997) (citation omitted), and "resolve all reasonable doubts about the facts in favor of the non-movant," *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am*., 894 F.2d 1555, 1558 (11th Cir. 1990) (citation omitted).

## IV.   DISCUSSION

### A. Jenkins's Federal Claims

Jenkins brings three federal law counts against Ala-Koch and Koch Foods (the Koch Defendants): Title VII sexual harassment, Title VII and § 1981 race discrimination and harassment, and Title VII and § 1981 retaliation. Both defendants move for summary judgment on these claims. Upon review, the Court concludes that the Koch Defendants' motions are due to be granted on all three claims.

### 1.   Title VII Sexual Harassment (Count I)[2]

In Count I, Jenkins brings a Title VII sexual harassment claim, alleging that the Koch Defendants subjected him to a sexually-motivated hostile work environment and quid pro quo sexual harassment by suspending and terminating him for refusing to engage in sex acts with McDickinson while Birchfield was present.[3] Of these two

---

[2] Count III is largely duplicative of Count I and is also considered here.

[3] Without citation or explanation, Jenkins's brief also states, in addition to being terminated for refusing the Birchfield proposals, that Jenkins was terminated because he refused "to continue to have sexual relations with McDickinson . . . ." (Doc. 194 at 55.) However, Jenkins cannot recall when he stopped having sex with McDickinson, and he was clear in his deposition that he did not believe McDickinson made the decision to fire him. Further, while Jenkins repeatedly testified that he had no clue when he stopped having sex with McDickinson, he also testified that it was after Birchfield,

theories, Jenkins presently only advances a claim for quid pro quo harassment and therefore the Court will only address that claim.[4]

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). One way that workplace sexual harassment can alter the terms and conditions of employment is if an "employee's refusal to submit to a supervisor's sexual demands results in a tangible employment action being taken against [him]." *Hulsey v. Pride Rests.*, 367 F.3d 1238, 1245 (11th Cir. 2004.)   This is sometimes called quid pro quo or tangible employment action harassment.[5]   "An employer is liable under Title VII if it (even unknowingly) permits a supervisor to take a tangible employment action against an

_____

"got rid of my ass," and he was "gone"—presumably meaning after he was terminated. (Doc. 182-2 at 51.) Therefore, given that Jenkins cannot recall when the relationship ended, let alone whether he actually ever refused to participate in the relationship, and that it may have been after he was terminated, the Court cannot rely on Jenkins's "refusal" of McDickinson's advances as the basis for Jenkins's tangible employment action claim. *See Minix v. Jeld-Wen, Inc.*, No. 3:05CV685-MHT, 2006 WL 2971654, at *3 (M.D. Ala. Oct. 17, 2006), *aff'd*, 237 F. App'x 578 (11th Cir. 2007) (holding that a plaintiff cannot create an issue of fact as to causation where the plaintiff can "not remember when the harassment occurred"). Instead, the Court focuses on Jenkins's January 2016 refusal to permit Birchfield to watch Jenkins and McDickinson have sex.

[4]Although the Complaint alleges that he was "subjected . . . to a hostile work environment," Jenkins only argues for sexual harassment liability under a quid pro quo theory in his summary judgment briefing. (Doc. 194 at 55 ("Jenkins' sexual harassment claim is based on the first theory of sexual harassment; a claim for tangible job action sexual harassment.").) Therefore, his sexually-motivated hostile work environment theory is deemed abandoned. *See Brackin v. Anson*, 585 F. App'x 991, 994 (11th Cir. 2014) ("The parties bear the burden of formulating arguments before the district court, and grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned and will not be considered . . . .").

[5] While the Court recognizes that there has been a shift away from the "quid pro quo" terminology, *see Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751 (1998), for purposes of brevity and readability, the Court uses the phrase here as a stand-in for the tangible employment action theory.

employee because [he] refused to give in to [the supervisor's] sexual overtures. That liability exists regardless of whether the employee took advantage of any employer-provided system for reporting harassment." *Id.*

An employer may defeat a quid pro quo claim by establishing that either (1) an employment decision did not rise to the level of a tangible employment action, or (2) there is no causal connection or causal link between the tangible employment action and the sexual requests/harassment. *See Taylor v. CSX Transp.*, 418 F. Supp. 2d 1284, 1297 (M.D. Ala. 2006) (citing *Ellerth*, 524 U.S. at 761, and *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006)).

It is well-settled that a termination constitutes a tangible employment action for quid pro quo purposes, a point that the Koch Defendants do not contest. *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1281 (11th Cir. 2003) ("A discharge is unquestionably a tangible employment decision."). Instead, they argue that Jenkins has not shown a genuine issue of fact as to whether there is a causal link between his termination and McDickinson's propositions involving Birchfield. The Court agrees.

Even when viewed in the light most favorable to Jenkins as the nonmovant, Jenkins has not established a causal connection between McDickinson's propositions, the last of which occurred in January 2016, and Jenkins's termination in late March for three reasons: (1) there is insufficient evidence in the record that

either McDickinson or Birchfield made the decision to terminate Jenkins; (2) the decision to terminate Jenkins occurred over two months after McDickinson's last proposition, and over five months after her first proposition; and (3) there was a legitimate, and well-documented, reason to terminate Jenkins that Jenkins has failed to rebut.

First, the record is devoid of any evidence—other than Jenkins's own speculation[6]—that either McDickinson or Birchfield made the decision to terminate him. *See Walton v. Johnson & Johnson Servs., Inc.,* 347 F.3d 1272, 1282 n.7 (11th Cir. 2003) (finding no causal link where there was no evidence that the harassing supervisor "played a role in the decision to terminate" the plaintiff); *Taylor v. CSX Transp.*, 418 F. Supp. 2d 1284, 1300 (M.D. Ala. 2006) (finding no causal link where there was "no evidence indicating" that the alleged harassers were involved in any of the adverse employment decisions). Typically, when the harasser is involved in the decision-making process, there can be an inference of a causal connection. *Id*. at 1301. But when the decisionmaker was not the harasser, no such inference is warranted. And here, Jenkins fails to present any evidence that either Birchfield or McDickinson had a role in terminating him.

---

[6] In the argument section of his brief opposing summary judgment, Jenkins exclusively relies on evidence that he "believed" and "felt" that Birchfield and McDickinson fired him. (Doc. 194 at 55.) In the facts section of his brief, Jenkins cites to Shaw's deposition testimony as evidentiary support that McDickinson and Birchfield fired Jenkins, but a review of this testimony reveals that it does not support Jenkins's position, as Shaw testified that he did not know who issued the order to fire Jenkins. (Doc. 182-4 at 25–26.)

Admittedly, Birchfield was the head of HR and often was responsible for terminating employees. However, Birchfield's position alone is insufficient to create an issue of fact as to who ultimately fired Jenkins. Especially when there is not a single employee who has testified that Birchfield or McDickinson issued the directive to fire Jenkins.  Rather, the evidence shows that Laura Cortes investigated Jenkins, suspended Jenkins, and ultimately signed Jenkins's termination paperwork along with Jenkins's supervisor, Shaw. Cortes even testified that the order to fire Jenkins came from Bobby Cotton, because Cotton "wanted [him] gone."  (Doc. 189-9 at 54.)

Second, even if there were evidence that McDickinson and Birchfield were involved in Jenkins's termination, Jenkins nevertheless still has failed to establish a causal link because of the temporal proximity between McDickinson's last proposition in January 2016 and Jenkins's termination on March 25, 2016. While "[t]emporal proximity between the harassment and a tangible employment action can give rise to a genuine issue of fact as to causation," Jenkins's termination happened over two months after he acknowledges the last proposition occurred.[7] *Minix v. Jeld-Wen, Inc*., No. 3:05CV685-MHT, 2006 WL 2971654, at *3 (M.D. Ala.

---

[7] Jenkins was last propositioned by McDickinson in January and he was not fired until late March. (Doc. 189-3 at 87.) Further, Jenkins cannot recall when his relationship with McDickinson began or ended and thus, "other through mere speculation, [Jenkins] cannot create a fact issue with respect to" the relationship with McDickinson. *Minix*, 2006 WL 2971654, at *3. (*See* Doc. 182-2 at 51.) In fact, the record indicates that Jenkins's relationship with McDickinson ended only after he was fired: "If I can recall when it stopped . . . I was gone, man." (*Id.*)

Oct. 17, 2006), *aff'd*, 237 F. App'x 578 (11th Cir. 2007) (quoting *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006)).  "[T]his period of time, without more . . . is too long for a factfinder to be able to conclude, other than by mere speculation, that there was a causal relationship between" the sexual propositions and the termination. *Id.* (finding a two-month gap between adverse action and predicate harassment, in isolation, to be insufficient to establish a causal connection, even when the ultimate decisionmaker of the employment action was the harasser).

Third, Jenkins fails to rebut the Koch Defendants' evidence showing that Jenkins was fired for a legitimate reason independent of the alleged harassment. *See Frederick v. Sprint/United Mgmt. Co*., 246 F.3d 1305, 1312–13 (11th Cir. 2001) (finding no causal link where the plaintiff failed to rebut the employer's legitimate reason to take an adverse employment action); *see also Walton v. Johnson & Johnson Servs., Inc.,* 347 F.3d 1272, 1282 (11th Cir. 2003) (finding no causal link because "the undisputed evidence is that [the plaintiff] was terminated" for reasons unrelated to the alleged harassment). Throughout 2015 and 2016, Jenkins routinely was written up for his attendance problems. Indeed, in December 2015, he was given his final warning. After that final warning, he was again caught taking a smoke break while on the clock, was reported, and ultimately was terminated by Cotton and Cortes for stealing company time.  Jenkins does not rebut these events or even

contest them in argument.  Thus, he has not rebutted the Koch Defendants' evidence that Jenkins was fired "on grounds independent of the alleged harassment . . . namely . . . [his] attendance problems." *Frederick*, 246 F.3d at 1312.

Therefore, even construing all inferences in Jenkins's favor, Jenkins has failed to present sufficient evidence to establish a causal connection between his termination on March 25, 2016, and the alleged harassment which had ended in January. Because there is no evidence of a causal connection, the Court pretermits discussion on the other elements of Jenkins's quid pro quo harassment claim, and concludes that summary judgment is due to be granted in favor of the Koch Defendants on Count I.

**2. Race Discrimination and Harassment (Count II)**

In Count II, Jenkins brings a race discrimination and harassment claim under Title VII and § 1981, arguing that he suffered a hostile-work environment and disparate treatment when he was "targeted as an African-American male and subjected to unwanted sexual advances and harassment." (Doc. 23 at 7; *see also* Doc. 1 at 15.) The Koch Defendants argue that summary judgment is appropriate because (1) Jenkins does not provide comparators outside of his protected class to establish discrimination, and (2) the alleged harassment was either welcomed or was not sufficiently severe or pervasive. (Doc. 180 at 30–31.) The Court agrees with the Koch Defendants on both fronts.

### a.  Disparate Treatment

Where, as here, there is an absence of direct evidence of race discrimination, to establish a prima facie case of race discrimination supported by circumstantial evidence, Jenkins must show that he (1) belongs to a protected class, (2) was subjected to an adverse employment action, (3) was qualified to perform the job in question, and (4) that the Koch Defendants treated similarly situated employees "outside [Jenkins's] class more favorably." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc).  Because Jenkins has failed to present evidence of similarly situated employees outside of his class, he cannot establish a prima facie case of race discrimination.

As to the fourth element, Jenkins presents no evidence of white comparators; instead, he points to several alleged similarly situated black employees.  (Doc. 194 at 53.) He argues that "it makes no difference that the individuals identified by Jenkins as receiving more favorable treatment than he are also African-American. If his race was a factor in the employer's employment decisions, the Defendants have violated . . . § 1981." (Doc. 194 at 53.)

What Jenkins seems to miss with this statement is that, when using circumstantial evidence to support a claim of discrimination, the comparison to similarly situated employees *outside* of the plaintiff's class is precisely what creates the inference that race was a factor in the employer's employment decisions. *See*

*Lewis*, 918 F.3d at 1228 (discussing the need for comparators outside of the plaintiff's protected class to "eliminate the most common nondiscriminatory reasons for an employer's action"); *Shelley v. Wesleyan Coll*., No. 21-10264, 2021 WL 4553021, at *3 (11th Cir. Oct. 5, 2021) (per curiam) (holding that the plaintiff "failed to establish a prima facie case of race discrimination under *McDonnell Douglas* because [he] failed to identify a similarly-situated comparator . . . outside [his] protected class.").

Absent such a comparison,[8] the Court has no evidence whatsoever that Jenkins was terminated because of his race as opposed to some other legitimate, race-neutral reason, such as absenteeism, when he has not shown through the use of comparators that white employees with similar infractions were treated more favorably. Because Jenkins has failed to establish the fourth element of a prima facie race discrimination claim, summary judgment is due to be granted in favor of the Koch Defendants on Count II.

### b.  Hostile Work Environment

---

[8] While a plaintiff's "failure to produce a comparator does not necessarily doom the plaintiff's case" because he may still point to "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker," Jenkins does not point to any circumstantial evidence, let alone a convincing mosaic, that he was fired because of his race. *Smith v. Lockheed-Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir. 2011). Jenkins also does not present any evidence that he was replaced in his position by a white employee, which is another means by which he could meet the fourth element of his prima facie case. *Hornsby-Culpepper v. Ware,* 906 F.3d 1302, 1312 n.7 (11th Cir. 2018).

In Count II, Jenkins also brings a claim for a racially motivated hostile work environment under Title VII and 42 U.S.C. § 1981.  To prove a claim under both statutes, Jenkins must prove the following:

> that he [or she] belongs to a protected group; (2) that he [or she] has been subject to unwelcome harassment; (3) that the harassment [was] based on a protected characteristic of the employee . . . (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Brant v. Jones*, 575 F.3d 1281, 1296 (11th Cir. 2009) (quoting *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (discussing how the elements and analysis of a hostile work environment claim are the same under § 1981 and Title VII)).

In their summary judgment motions, the Koch Defendants argue that Jenkins cannot establish that he was subjected to sufficiently severe *unwelcome* harassment. (Doc. 199 at 29.) The harassment alleged here can be broken into two categories: (1) Jenkins's sexual relationship with McDickinson, and (2) McDickinson's propositions that Jenkins allow Birchfield to watch as she and Jenkins engage in sex acts. Both harassment categories fail to predicate a hostile work environment claim

for different reasons, even when the Court assumes for the sake of argument that Jenkins's race was a but-for cause of these sexual overtures.[9]

First, despite the troubling nature of McDickinson and Jenkins's relationship, their liaisons cannot constitute unwelcome harassment under the facts presented here. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) ("The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'"). In fact, months after being fired, Jenkins described the relationship in sworn declarations as "consensual."[10]

Aside from Jenkins's own acknowledgements that the relationship was consensual, the record shows that Jenkins's conduct failed to indicate that the relationship was unwelcome. Everything about the relationship, apart from the power imbalance inherent within a supervisor-employee relationship, indicates that the relationship was indeed welcome and consensual. *See id*. ("The correct inquiry is whether respondent by [his] conduct indicated that the alleged sexual advances were unwelcome . . . .").

---

[9] Both parties dedicate a lot of ink to debating causation and whether the alleged harassment was because of Jenkins's sex, race, both sex and race, or neither sex nor race. The Court declines to rule on this issue considering the Court's findings on the severity and welcome nature of the harassment. While Jenkins abandoned his claim for a sexually motivated hostile work environment, *see supra* part IV.a.1, had he pursued that claim the analysis would be the same as the foregoing analysis regarding unwelcome harassment and severity for his racially motivated hostile work environment claim, and summary judgment would also be appropriate for the sexually motivated hostile work environment claim.

[10] "When we were at the bar, [McDickinson] showed an interest in me, and we began a sexual relationship." (Doc. 182-12 at 9, signed May 20, 2016.) "In October 2015, Ms. McDickinson approached me to engage in a consensual sexual affair. Soon after, we began a sexual relationship that was indeed consensual." (Doc. 189-3 at 84, signed June 17, 2016.)

22

The relationship lasted for months. When Jenkins and McDickinson were not having sex, they regularly spoke on the phone with one another. When they were having sex, they would meet all over town and at all times of the day. Jenkins met with McDickinson at work and at various locations throughout town, at night and during the day, with friends and family present and by themselves, at friends' houses and in each other's cars. Jenkins testified that he would take the time to put a condom on before having sex with McDickinson, that he enjoyed their sexual trysts, and that he had an orgasm during each encounter except one occasion on which a co-worker interrupted them in McDickinson's office. Further, there is no evidence that McDickinson ever conditioned their relationship with threats, and Jenkins never reported or complained to anyone during the months-long affair. *See Miles v. City of Birmingham*, 398 F. Supp. 3d 1163, 1180 (N.D. Ala. 2019) (emphasizing that the "crux of the welcomeness inquiry" is whether the "employee's conduct indicated that the sexual advances were unwelcome" not whether the relationship is characterized as unwelcome after-the-fact"); *Waltz v. Dunning*, No. 2:13-CV-00517-JEO, 2014 WL 7409725, at *9 (N.D. Ala. Dec. 31, 2014) (finding sexual relationship was not unwelcome when viewing the plaintiffs conduct in totality revealed a consensual relationship).

And during each sexual encounter, Jenkins never physically or verbally attempted to end the interaction or communicate to McDickinson that her advances

were unwelcome. In fact, on several occasions, while in McDickinson's office, Jenkins would briefly interrupt their sex act to walk across the room, lock the door to ensure the two would not be caught, and then walk back to McDickinson to further engage in sexual activity. If anything, Jenkins's conduct during the relationship ensured the relationship could continue in secret.  In short, based on Jenkins's own description of the sexual relationship as consensual and his conduct confirming that characterization, the Court concludes that Jenkins has failed to present sufficient evidence that his sexual relationship with McDickinson was unwelcome. *See Miles*, 398 F. Supp. 3d at 1180 (finding long term romantic relationship was not unwelcome between boss and subordinate despite plaintiff ultimately testifying she felt as if they she had no choice); *Murdoch v. Medjet Assistance, LLC*, 294 F. Supp. 3d 1242, 1261 (N.D. Ala. 2018) (finding that alleged harassment was not unwelcome where the plaintiff lacked conduct "indicating that [her boss's] . . . actions involving her were unwelcomed"); *Diepenhorst v. City of Battle Creek*, No. 1:05-CV-734, 2007 WL 1141492, at *5 (W.D. Mich. Apr. 17, 2007), *aff'd*, 282 F. App'x 412 (6th Cir. 2008) (finding a sexual relationship was welcome in light of the plaintiff's conduct during the relationship despite the plaintiff subsequently testifying that her "subjective intent was to get the encounter[s] over with . . . ."); *cf. Good v. Omni Hotels Mgmt. Corp.*, No. 1:07-CV-0621-HTW-AJB, 2008 WL 11322930, at *10 (N.D. Ga. Aug. 15, 2008), *report and recommendation adopted*, No. 1:07-CV-0621-HTW, 2009

WL 10665813 (N.D. Ga. Jan. 20, 2009) (finding a jury issue as to whether oral sex was welcome where the plaintiff received oral sex to completion and then pushed the defendant away, ended the relationship, and complained about the incident to a third party).

Second, Jenkins has failed to provide sufficient evidence showing that McDickinson's verbal propositions were sufficiently severe or pervasive to state a hostile work environment claim. The severe or pervasive analysis first asks a court to consider whether the plaintiff subjectively perceived the harassment as severe or pervasive, and second asks the court to determine whether that perception is objectively reasonable. *See Lockett v. Choice Hotels Intern., Inc.*, 315 F. App'x 862, 865 (11th Cir. 2009) (per curiam). Courts typically use four factors when deciding whether conduct meets the objective inquiry: "(1) the frequency of the [discriminatory] conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with an employee's job performance." *Id*. at 865–66.

Here, construing the facts in the light most favorable to Jenkins, McDickinson asked Jenkins to allow Birchfield to watch them have sex; the first request occurring in November 2015 and the last in January 2016, two months before Jenkins was

ultimately fired. These propositions are objectively insufficient to support a hostile work environment claim when considering the factors listed above.

First, the propositions were infrequent, occurring only a handful of times over the course of two months before stopping completely once Jenkins made clear that he was not willing to consent to such an arrangement. *See Allen v. Ambu-Stat, LLC*, 799 F. App'x 703, 709 (11th Cir. 2020) (per curiam) (finding that five comments spread over four months can "hardly be described as frequent"); *Corbett v. Beseler*, 635 F. App'x 809, 816 (11th Cir. 2015) (per curiam) ("These comments, however, were isolated and sporadic. . . [The plaintiff] does not represent, and the record does not show, that [harassing comments] were daily occurrences; therefore, they were not sufficiently pervasive to constitute a hostile work environment.").  Second, the propositions themselves were not severe, especially given that they were made to Jenkins by McDickinson at a time when Jenkins already was having consensual sex with McDickinson. Third, the referenced propositions were not physically threatening or humiliating. *See Lockett*, 315 F. App'x at 866 (sexual remarks and even "two incidents of brief touching" fell below "the minimum level of severity or humiliation needed to establish sexual harassment"). And fourth, there is no evidence that the propositions interfered with Jenkins's employment. *Id.* (discussing classic examples of work interference including poor job performance, desire to quit, and an inability to improve at the job).

Viewing all four severe or pervasive factors in totality, Jenkins has failed to present sufficient evidence showing that the workplace harassment—here, McDickinson's verbal propositions—was sufficiently severe or pervasive to support a hostile work environment claim. Therefore, summary judgment is due to be granted on Count II in favor of the Koch Defendants.

### 3. <u>Retaliation (Count IV)</u>

In Count IV, Jenkins brings a claim against the Koch Defendants alleging that he was retaliated against for complaining to Bobby Elrod about McDickinson's and Birchfield's alleged harassment. (Doc. 23 at 9.)  Like several of Jenkins's other allegations, he failed to respond to the Koch Defendants' summary judgment arguments regarding his retaliation claim. In fact, Jenkins completely ignores this claim in his brief opposing the Koch Defendants' summary judgment motion. Therefore, as to Count IV, Jenkins has abandoned this claim and it is due to be dismissed.[11] *See Brackin v. Anson*, 585 F. App'x 991, 994 (11th Cir. 2014) (per curiam).

---

[11] Nonetheless, summary judgment would still be appropriate because Jenkins's purported protected activity—complaining to Elrod—occurred *after* the adverse action (termination) was taken, negating causation. Jenkins originally claimed in a declaration that he complained to Elrod after he was fired, but in a subsequent declaration, he changed his story and asserted that he complained to Elrod while he was suspended but *before* he was fired. (Doc. 182-12 at 10; Doc. 189-3 at 86.)  Given the inherent contradiction in the statements, the Court finds that, at least in part, the second affidavit is a sham and Jenkins's secondary timeline will not be considered. *See Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986) ("[T]he affidavit should be disregarded as a sham. Its flat contradiction to the earlier [testimony] was unexplained and therefore was inadequate to raise a genuine issue of fact which was denied to exist by the earlier deposition."); *see also Baggett v. Rehau, Inc.*, No. CV 07-PWG-2224-S, 2009 WL 10674316, at *5 (N.D. Ala. Oct. 15, 2009), *report and recommendation adopted*, No. 2:07-CV-2224-LSC, 2010 WL 11530355 (N.D. Ala. Jan. 21, 2010), *aff'd*, 411 F. App'x 280 (11th Cir. 2011) (applying the sham affidavit rule to prior written evidence).  Similar alleged contradictions form the basis of the Defendants' Joint Objections and Motion to Exclude.

## B. Jenkins's State Law Claims

Having disposed of Jenkins's federal law claims, the Court turns to Jenkins's four state law claims: assault and battery, invasion of privacy, outrage, and negligent supervision/hiring. The Defendants move for summary judgment on the basis that the alleged harassment was not unwelcome. (Doc. 177-1 at 28–33.)

The assault and battery, invasion of privacy, and outrage claims are all based on the same conduct: Jenkins's sexual encounters with McDickinson that he now contends were unwelcome due to the power imbalance in the workplace.[12] (*See* Doc. 194 at 60–64) ("Recognizing her power over him and his inability to refuse her, McDickinson touched Jenkins inappropriately, performed fellatio on Jenkins and had sexual intercourse with him.").

However, Defendants argue, and this Court agrees, that these three claims fail because, as discussed above, there is no genuine issue of fact as to whether the

---

(Doc. 198.)  Other than the aforementioned contradiction, the other grounds asserted by the Defendants are irrelevant for purposes of the pending dispositive motions and therefore the Motion to Exclude will be denied as moot.

[12] It appears from the briefing that Jenkins only brings these state law claims against McDickinson and has abandoned these claims as to Birchfield. However, to the extent that Jenkins brings these claims against Birchfield on the basis that McDickinson asked Jenkins on Birchfield's behalf if he could watch them have sex, summary judgment would still be appropriate. First, these propositions do not feature any touching, let alone an offensive touching, as required for an assault and battery claim. Second, these propositions were not "so outrageous that [they] caused the plaintiff mental suffering, shame or humiliation (for invasion of privacy) or that [they could not] be tolerated in a civilized society (for [outrage])" especially given that the propositions were made by McDickinson—the person who Jenkins was already in a consensual relationship with—*not* Birchfield. *See Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1308–09 (11th Cir. 2007); *see also Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1194 (Ala. 1998) (holding that "making sexual propositions usually [does] not constitute an invasion of privacy," let alone outrage).

relationship was consensual and welcome. Indeed, Jenkins fails to grapple with his own testimony that he enjoyed receiving oral sex; that he achieved an orgasm during almost every sexual encounter; that he reciprocated McDickinson's advances and would make the conscious decision to put on a condom; that he would meet her all over town, at all times, and with co-workers, friends, and family present; that he never felt threatened by McDickinson; that he felt comfortable refusing McDickinson's requests if he wanted to—like refusing to break up with his girlfriend and refusing to allow Birchfield to watch; that he never complained or reported McDickinson once during their prolific, months-long affair; and that he himself described the relationship as consensual on multiple occasions, even after being fired.

Because the relationship was consensual and welcome, Jenkins's assault and battery, invasion of privacy, and outrage claims all collaterally fail. First, assault and battery requires a touching that was "harmful and offensive," an element that is absent from a consensual sexual interaction. *See Ex Parte Atmore Cmty. Hosp.*, 719 So. 2d 1190 (Ala. 1998); *see also Waltz v. Dunning*, No. 2:13-CV-00517-JEO, 2014 WL 7409725, at *9 (N.D. Ala. Dec. 31, 2014) (granting summary judgment as to assault and battery claim because "all of the evidence . . . considered together" made "clear" that the sexual relationship was consensual). Second, invasion of privacy requires an intrusion that would "outrage or cause mental suffering, shame or

humiliation to a person of ordinary sensibilities." *Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 826 (Ala. 1999) (quoting *Phillips v. Smalley Maint. Servs., Inc.,* 435 So. 2d 705, 711 (Ala. 1983)). A months-long, consensual sexual relationship that a plaintiff admittedly enjoys does not cause a person of ordinary sensibilities tortious mental suffering. Third, and finally, a consensual relationship is not a form of "egregious sexual harassment" as required by an outrage claim. *Edwards v. Hyundai Motor Mfg. Ala., LLC*, 603 F. Supp. 2d 1336, 1354 (M.D. Ala. 2009). Summary judgment is due to be granted as to all three of these tort claims.

Having granted summary judgment on the three underlying tort claims, summary judgment is also appropriate in the Koch Defendants' favor on Jenkins's negligent supervision/hiring claims because "a party alleging negligent supervision and hiring must prove the underlying wrongful conduct [based on common law torts] of the defendant's agents," and when there is no viable underlying tort, there can be no negligent supervision claim. *Univ. Fed. Credit Union v. Grayson*, 878 So. 2d 280, 291 (Ala. 2003).

## VI.  CONCLUSION

Accordingly, it is hereby ORDERED as follows:

1.  The Motion for Summary Judgment filed by Koch Foods of Alabama LLC (Doc. 179) is GRANTED;

2.   The Motion for Summary Judgment filed by Koch Foods, Inc. (Doc. 181) is GRANTED;

3.   The Motion for Summary Judgment filed by Melissa McDickinson (Doc. 177) is GRANTED;

4.   The Motion for Summary Judgment filed by David Birchfield (Doc. 178) is GRANTED; and

5.   The Defendants' Joint Objection and Motion to Exclude (Doc. 198) is DENIED as moot.

DONE, on this the 14th day of January, 2022.

_____/s/ R. Austin Huffaker, Jr.\_\_\_\_\_
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE
